### HARBISON-WALKER REFRACTORIES CO. v. PORTSMOUTH REFRACTORIES CO.

(Circuit Court of Appeals, Sixth Circuit. June 17, 1921. On Motion for Rehearing, October 12, 1921.)

No. 3501.

1. **Mines and minerals** ⬤⟷71—**Right to mine on tract, given by lease contract, held not exclusive.**

A right given by a contract to mine fire clay and coal on a 720-acre tract of land on a royalty basis *held* not exclusive, and a subsequent lease giving to another similar rights on a part of the tract *held* valid, and to give equal rights on such part.

2. **Mines and minerals** ⬤⟷71—**Separate lessees on same tract held to have equal rights.**

Where plaintiff and defendant were operating on the same tract of land under separate leases giving them equal rights to mine fire clay and coal, each was bound to operate its mines in accordance with good mining methods and to avoid, so far as reasonably possible, any interference with, or damage or hindrance to, the operations of the other, and is liable only for violation of such duty; neither having the right to segregate and claim exclusive rights in any part of the tract.

Appeal from the District Court of the United States for the Western Division of the Southern District of Ohio; John W. Peck, Judge.

Suit in equity by the Portsmouth Refractories Company against the Harbison-Walker Refractories Company. Decree for complainant, and defendant appeals. Reversed and remanded for modification.

On the 11th day of May, 1907, the York Portland Cement Company, a corporation, was the owner of a tract of land containing 720 acres in Washington township, Lawrence county, Ohio, and was then and there engaged in stripping operations on this land for limestone, which it used in the manufacture of cement. This land was and is underlaid with seams of fire clay and coal, which in the course of this stripping operation for limestone it became necessary to remove.

On the date above named, the York Portland Cement Company entered into a contract with the Portsmouth Refractories Company, also a corporation, by the terms of which it agreed for a price stipulated therein, to furnish to the Portsmouth Company the plastic fire clay, flint fire clay, sand rock fire clay, and coal which was moved by it in the course of its stripping operation for limestone. It was further agreed that in case these minerals, so procured from the stripping operation, were not sufficient to supply the demands and requirements of the Portsmouth Refractories Company, the Cement Company

___

⬤⟷For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes

might produce sufficient for that purpose by opening drift mines, irrespective of and apart from the stripping operation. It was further provided in this contract that, if the Cement Company should cease operating its land for its own raw material and should not elect to open drift mines thereon to supply the Portsmouth Refractories Company with the necessary material, the Portsmouth Company, upon the failure of the Cement Company to supply its demands and requirements, should have the right and privilege of putting in its own mines on said land of the Cement Company in such manner as would not interfere with the operation of the Cement Company, for the purpose of supplying itself with material for its own use, and that the Portsmouth Company should pay to the Cement Company an agreed royalty for all material mined by it. Shortly thereafter the Cement Company discontinued the stripping operation on this land for limestone, and elected not to open any drift mines to supply the Portsmouth Refractories Company with coal and clay, and the Portsmouth Company thereupon proceeded to and did open up coal mines and clay mines at different places upon this property.

On the 6th day of December, 1913, the York Portland Cement Company, by and through its receiver, sold and conveyed this land to Levi D. York, who is still the owner thereof. On the 17th day of June, 1914, Levi D. York entered into a contract of lease with the Harbison-Walker Refractories Company, by the terms of which it granted to that company the exclusive right and privilege to enter upon 250 acres of this 720-acre tract for the purpose of exploiting, mining, and removing fire clay therefrom. This 250 acres is specifically described in the lease by metes and bounds. It was also further provided that the right to mine, granted to the Harbison-Walker Refractories Company by this lease, should include all practical methods then in use, or which might thereafter be used, and the use of improved machinery and fixtures or appliances for said purposes, and the right to strip the surface for, excavate, dig, bore, draft, quarry, and otherwise explore for and mine said minerals, with the right to remove all pillars and supports that may be left in the progress of said mining. On the 23d day of August, 1916, Levi D. York made, executed, and delivered to the Harbison-Walker Refractories Company another contract of lease, containing similar terms and provisions, for two other small tracts of land, aggregating about 120 acres, which land was also a part of the original 720-acre tract covered by the Portsmouth Refractories Company's contract.

Shortly after the execution and delivery to it of the first lease in 1914, the Harbison-Walker Refractories Company began operation in the extreme lower end of the 250-acre tract for the mining and removal of clay by drift mines, which operation was abandoned shortly after the second lease was executed, and the lessee then began stripping operations for No. 5 clay at some distance north of its first operation, and in the immediate vicinity of drift mines then being operated for the production of coal by the Portsmouth Refractories Company. It further appears from the evidence that it is materially cheaper to obtain fire clay by stripping than by drift mining, where the over burden is not too great; that at the place where the stripping operations were commenced and prosecuted by defendant "there was a comparatively small over burden, so that the clay could be obtained quite cheaply"; that the defendant could not have stripped in the neighborhood of the first drift mines it opened on account of the steepness of the hill, and that the place where it began to strip was the nearest to such first operation by defendant where stripping was practicable. The Portsmouth Refractories Company was then and still is securing its clay some distance south of its brick plant, on a portion of the 720 acres not covered by the Harbison-Walker lease. These stripping operations continued until they had passed some distance beyond the coal mine then being operated by the Portsmouth Refractories Company.

After it had secured all the clay available by the stripping process over and above and in the immediate vicinity of the Portsmouth Company's coal mine, it opened up several drift mines for clay at a point where the stripping operations ceased by reason of the increased overburden. These drifts, after progressing into the hill about 150 feet, were abandoned, for the reason, as stated by witnesses for plaintiff in error, that the roof began to give them

so much trouble that it became necessary to abandon them temporarily and start new openings, with the intention to work around the old drifts in an effort to reclaim them. It appears that during the time these operations were in progress, and up until the time of the commencement of this suit in May of 1918, the Portsmouth Company made no objection or protest directly to the Harbison-Walker Company, but in July, 1917, wrote a letter of complaint to Levi D. York, who in turn notified the Harbison-Walker Company of the substance of this letter. Thereupon Mr. Campbell, district mine superintendent of the Harbison-Walker Company, telephoned Mr. Hitchcock, president of the Portsmouth Company, requesting that he meet him at these mines and try to arrange some amicable understanding. In reply to this, Mr. Hitchcock stated, in effect, that a meeting was useless, and that the Harbison-Walker Company would have to discontinue its mining operation, as otherwise it would absolutely ruin the Portsmouth Company's coal mine. Mr. Hitchcock made some further protests to Mr. York from time to time, but no further protest was made directly to the Harbison-Walker Company.

On the 28th day of May, 1918, the Portsmouth Company filed in the common pleas court of Scioto county, Ohio, a petition against the Harbison-Walker Company, averring among other things that its grant from the York Portland Cement Company to open, maintain, and operate mines upon said premises is prior in time and paramount in right to the grant of York to the Harbison-Walker Company; that the defendant acquired no rights, privileges, uses, easements, or grants by virtue of its leases from said York, but, on the contrary, the same are void and of no effect.

The plaintiff further averred that, even if said leases from York to the Harbison-Walker Refractories Company were valid leases, the defendant, in violation of the rights of the plaintiff, opened mines and conducted stripping operations at such locations and in such manner as wrongfully and unlawfully to interfere with plaintiff in the exercise of its rights and privileges under its grant from the York Portland Cement Company, and had thereby destroyed its roadways, natural and artificial drainage and caused water to be collected on the surface above plaintiff's mines, where defendant had conducted stripping operations, and also in the openings or drifts that had been abandoned by defendant, so as to cause the plaintiff's mine to become wet, difficult, and expensive to operate, and necessitating systems of drainage not otherwise necessary; that defendant had also, in its mining operation, used high and dangerous explosives, thereby imperiling the lives and safety of plaintiff's employés; and further averred that the continuance of such wrongful, improper, negligent, and unlawful operation of these mines by defendant would deprive plaintiff of its convenient access to coal and fire clay, which minerals are the necessary raw materials for its plant.

The prayer of the petition asked: (1) That the defendant be enjoined from operating any mine or mines upon any part of the 250-acre tract. This was upon the theory that the grant from York to the defendant is null and void, and in conflict with and subservient and subject to the rights of the plaintiff. (2) That if the court should find that the defendant had under the York leases acquired the rights, privileges, and easements to operate and maintain said mines, it be enjoined from obstructing the drains of the plaintiff, destroying its roadway, dumping either in such manner and places that the same may slip over and upon the entrance of the mines of the plaintiff, obstructing natural water courses, casting rock, earth, and débris upon the premises of the plaintiff by explosives or otherwise, and operating about the mines of the plaintiff to such an extent as to interfere with the same. (3) For damages in the sum of $150,000.

Upon petition of the defendant this cause was removed from the state court to the United States District Court, Southern District of Ohio, Western Division, in which court the defendant filed an answer admitting its corporate capacity, the contract of the plaintiff with the York Portland Cement Company, the sale of this property to York, the leases executed by York to the defendant, and that it was operating upon this 250-acre tract; denied it wrongfully, unlawfully, and in violation of the rights of plaintiff, opened such mines at such location and in such manner as wrongfully and unlawfully to

interfere with the plaintiff in the exercise of its rights under its contract with the York Portland Cement Company; that it had destroyed or obstructed roadways, natural or artificial drains, or that it had conducted its mining operation in a wrongful, improper, negligent, or unlawful manner; and further denied that the plaintiff had been damaged by it in any sum or amount whatever.

On the issue so joined the district court found that the plaintiff had no exclusive rights in this property, that the defendant's leases from York were valid, and that the rights of the plaintiff to conduct mining operations on this 250-acre tract to supply itself with so much clay and coal as may be necessary for the carrying on of its business, was contemporaneous and coexistent with the defendant's right of operation. The court further found upon the issues of fact in this case for the plaintiff, and enjoined the defendant from carrying on any mining operations over, and above the mines of the plaintiff, and while there remains a reasonable, available supply of fire clay and coal for the defendant to work elsewhere on the lands leased by it from Levi D. York, and from operating within the region laid off and surveyed by the plaintiff for its mining operations as shown by the white dotted lines on the map, introduced in evidence in the District Court and marked Exhibit No. 5, except that the defendant may haul over the surface of any lands contained within said region.

Walter Schmitt, of Cincinnati, Ohio, and Oscar W. Newman, of Columbus, Ohio (Bettinger, Schmitt & Kreis, of Cincinnati, Ohio, and James E. MacCloskey, Jr., of Pittsburgh, Pa., on the brief), for appellant.

Charles H. Stephens of Cincinnati, Ohio, and Henry Bannon, of Portsmouth, Ohio (Charles H. Stephens, Jr., of Cincinnati, Ohio, on the brief), for appellee.

Before KNAPPEN, DENISON, and DONAHUE, Circuit Judges.

PER CURIAM. [1, 2] The District Court properly held that the lease from York to the Harbison-Walker Refractories Company is valid; that the rights of the plaintiff and defendant to mine and remove coal and clay from this 250 acres of land were and are contemporaneous and coexistent. Therefore it was the duty of each, in the exercise of these rights and privileges, to avoid, so far as reasonably possible, any interference with, or damage or hindrance to, the other party having equal rights in these premises; but it by no means follows that the plaintiff, whose rights extended to the entire 720 acres, could, by the location of its coal mine on this 250 acres, in which both parties had equal rights, appropriate to itself all the fire clay and the coal situated in the locality of its coal operations.

Nor could it by surveying, in connection with the mine it was actually operating, a large acreage of this 250-acre tract, in which both plaintiff and defendant had an equal interest, sequester to itself both the coal and the clay in that tract so surveyed, to the exclusion of the defendant, who, at the time this action was brought and for almost two years prior thereto, in pursuance of its lawful rights under its lease from York, was engaged in the active mining of clay and coal from the tract so surveyed by plaintiff, and without any protest on the part of plaintiff other than as appears in the statement of facts. Nor did the plaintiff in its petition claim that by the location of its coal mine at this place it appropriated to itself the fire

clay lying above the coal seam, nor did it ask, in the event that the court held that the defendant's lease is valid, that the defendant be enjoined from mining or removing clay or coal from any portion of this 250 acres, except *above its mines,* and even in that respect the prayer of the petition is that the defendant be enjoined from "operating above the mines of the plaintiff to such an extent as interferes with the same."

Evidence was introduced, however, on the part of the plaintiff tending to prove that it is not proper practice to mine this fire clay before or during the mining of the coal. Evidence was also introduced on the part of the defendant tending to prove that the mining of the clay first is the proper practice and good mining methods, for the reason that the subsidence of the earth's surface where coal has been removed makes it more difficult and expensive to remove the upper strata of clay.

Whether it is or is not the better practice to remove the coal first, where one individual or corporation owns the exclusive right to mine and remove both clay and coal is not determinative of the question presented in this case. It is clear from this evidence that the mining of either clay or coal first necessarily injuriously affects, to some extent, the mining of the other mineral later. Nevertheless the evidence in this case is not such as to show that the mining of the clay first has such an injurious effect upon the mining of the coal later that one lessee, having a right to mine the clay, should be enjoined from so doing until another lessee, having the right to mine the coal, has removed all the coal therefrom, thereby causing such an irregular subsidence of the earth's surface as to make the mining of the clay more difficult and expensive. The situation in this case is not different, so far as this question is concerned, than if the plaintiff had the exclusive right of mining the coal only, and the defendant had the exclusive right of mining the clay only. Nor does it appear that the stripping operations necessary to mine and remove this clay differs in any respect from the rights reserved by the York Cement Company to strip and remove the surface for limestone, for it appears from the contract between the York Cement Company and the Portsmouth Company that the stripping operation, in which the York Cement Company was then engaged, extended, not only to the removal of the fire clay, but the coal also.

The evidence offered in the trial of this case fully sustains the finding of the trial court that the defendant, in the exercise of its right to mine and remove this clay, did not avoid, as far as possible, any interference with, or damage or hindrance to, the plaintiff in the operation of its coal mine, in that it destroyed the plaintiff's roadways to the timber land, without providing other roadways substantially as convenient, and that it failed to make any effort whatever to drain the water collecting on the surface of the ground over plaintiff's actual mining operation, after it had finished stripping the same. However, keeping in mind the relative, contemporaneous, and coexistent rights of the parties to this action, and the duty of each in the exercise of these rights and privileges to avoid as far as pos-

sible any interference with, or damage or hindrance to, the other lessee, and keeping also in mind the fact that the defendant's rights are restricted to about one-half of the 720-acre tract covered by the plaintiff's contract, and that but comparatively only a small portion of this can be mined to advantage by stripping, it would seem that the equities of this case would be fully served by limiting the plaintiff's relief, by way of injunction, to the prayer of its petition that the defendant be restrained from obstructing the drains of the plaintiff, destroying its roadways, dumping earth in such manner and places that the same may slip over and upon the entries of the mines of the plaintiff, obstructing natural water courses, casting rock, earth, and débris upon the premises of the plaintiff by explosives or otherwise, operating above the mines of the plaintiff to such an extent as unreasonably interferes with the same; and it is therefore ordered and decreed that the injunction as granted by the District Court be so modified.

The judgment of the trial court, awarding the plaintiff damages in the sum of $120, is affirmed.

It does not clearly appear, from the order of reference to ascertain the further damages of the plaintiff, whether the special master commissioner is or is not directed, in the ascertainment of such damages, to take into account the water accumulating in the drifts made by the defendants to remove the clay after it had finished stripping operations over defendant's working place. The right of the plaintiff to recover damages upon this ground, of interference with its rights, depends entirely upon whether the defendant in making these drifts was simply gouging for the purpose of securing clay as cheaply as possible, or was in good faith attempting to operate drift mines to remove all available clay therefrom. In the latter case, the damages to the plaintiff would be merely incidental to the defendant's lawful and proper exercise of its right to mine and remove this clay. Upon this question there is a serious conflict in the evidence. The defendant offered evidence tending to prove that it was operating in good faith and was compelled to abandon these drifts temporarily, on account of the condition of the roof, but that it was and is its intention to work around the old drifts in an effort to reclaim them. There is some evidence offered on the part of the plaintiff that these drifts are merely gouges. Wangler, a civil and mining engineer of Dayton, Ohio, who has been engaged in that profession a little over 20 years, was called as an expert witness on behalf of the plaintiff. He testified in reference thereto as follows:

"This gouge—I will say drift; I don't want to use that word 'gouge,' because it don't sound good to me; I don't believe it was the intention to do that at all; I don't believe it was the intention of the Harbison-Walker Company to gouge that property, what is called a gouge, because I believe it is a drift. * * * The observation that I had of that was that they had done a lot of timbering there. * * * Extra heavy timbers, probably eight, ten, twelve inch timbers, I imagine, and as I remember they were probably four to six feet apart on either side of the roadway."

This witness was certainly well qualified to tell a drift from a gouge. He was a disinterested witness, yet his evidence was wholly

favorable, in practically all other respects, to the plaintiff, and naturally this part of his evidence favorable to the defendant should be given serious consideration by a court or jury, as against the evidence of an interested or clearly antagonistic witness. It would therefore appear that the order to the master commissioner, directing him to ascertain further damages due to the plaintiff, should specifically exclude from the master's consideration unavoidable damages incident to the proper, careful, and legitimate exercise by the defendant of its right to mine and remove this clay, and the order of reference should be so modified as specifically to direct the special master commissioner to ascertain the reasonable cost of constructing and maintaining sufficient drains to carry away the water which it may be reasonably anticipated will accumulate in the pits and low places above and reasonably approximate to plaintiff's mine, caused and produced by the defendant's stripping operations.

For the purpose of accomplishing such modifications the decree is reversed as to the injunction, and as to the order of reference, and this cause is remanded to the District Court, with directions to enter such modified decree.

The judgment against defendant for costs in the District Court is affirmed. In this court each party will pay its own costs, and judgment may be entered accordingly.

### On Motion for Rehearing.

While the petition of the Portsmouth Refractories Company does not ask that the Harbison-Walker Refractories Company be enjoined from the operation of its coal mine upon the 250-acre tract described in its petition for reasons other than as averred in its petition, that the alleged grant from Levi D. York to the defendant is null and void and of no force and effect, and in conflict with the rights of the plaintiff, and subservient to the rights of the plaintiff, nevertheless evidence was introduced, without objection, tending to show that it is operating its coal mine in such near proximity to plaintiff's coal mine that in one place it has broken through and into plaintiff's mine.

It is therefore further ordered and adjudged, upon the motion for rehearing, that the plaintiff be permitted by the District Court to amend its petition in this respect to conform to the evidence, and that upon such amended petition the Harbison-Walker Refractories Company be enjoined from operating its present coal mine in the direction of the present workings of the appellee's coal mine, but may work the same only in an easterly and southerly direction, until it reaches and passes the east dotted line on the map of the Portsmouth Refractories property referred to in the decree of the District Court.

The motion for rehearing is overruled.